**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>TODD BECKER,<br><br>      Defendant. | No. CR06-3022-MWB<br><br>**ORDER CONCERNING MAGISTRATE'S REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTIONS TO SUPPRESS** |

_____

**TABLE OF CONTENTS**

*I.   INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *A.  Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *B.  Objections To Report and Recommendation* . . . . . . . . . . . . . . . . . . . 7
      1.   *Necessity for Miranda warnings* . . . . . . . . . . . . . . . . . . . . 7
      2.   *Reasonable suspicion to conduct search* . . . . . . . . . . . . . . . 11
      3.   *Consent to conduct search* . . . . . . . . . . . . . . . . . . . . . . 16

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## I. INTRODUCTION AND BACKGROUND

### A. *Procedural Background*

On November 16, 2006, a superseding indictment was returned against defendant Todd Becker charging him with conspiracy to distribute 5 grams or more of pure methamphetamine and 500 grams or more of a mixture or substance containing methamphetamine and marijuana all within 1000 feet of a school after being convicted of a felony drug offense, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), 841(b)(1)(D), 846, 851, and 860, and possessing 5 grams or more of pure methamphetamine with intent to distribute and possessing marijuana all within 1000 feet of a school after being convicted of a felony drug offense, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 841(b)(1)(D), 851, and 860. Defendant Becker has filed two motions to suppress. In one motion, he seeks to suppress evidence obtained during a search of his person and his residence on January 3, 2006, and in the other motion he seeks to suppress statements he made to law enforcement officers at the time of the search. Defendant Becker challenges the search of his residence on the ground that his probation officer lacked reasonable suspicion to justify a search of his residence under the terms of Becker's probation agreement. Defendant Becker also argues that he did not consent to a search of his residence. With respect to his second motion to suppress, concerning his statements to his probation officer and the police, Becker claims any statements he made are inadmissible because they were made during "the functional equivalent of custodial interrogation," and were obtained without his having been informed of his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436, 439 (1966).

Defendant Becker's motion to suppress was referred to United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). Judge Zoss conducted an evidentiary hearing and then filed a Report and Recommendation in which he recommends that

2

defendant Becker's motion to suppress be denied. Judge Zoss concluded that defendant Becker's probation officer had reasonable suspicion to conduct a search of Becker's residence under the terms of Becker's probation agreement. Judge Zoss alternatively found that defendant Becker voluntarily consented to a search of his residence. Judge Zoss further concluded that no *Miranda* warnings were required for Becker's probation officer and the police to talk with Becker prior to his formal arrest because Becker was not in custody at the time he made his statements. Therefore, Judge Zoss recommended that both of defendant Becker's motions to suppress be denied. Defendant Becker has filed objections to Judge Zoss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Becker's motions to suppress.

### *B. Factual Background*

In his Report and Recommendation, Judge Zoss made the following findings of fact:

> On November 1, 2005, Becker was placed on two years' probation by the State of Iowa for possession of methamphetamine, second offense, an aggravated misdemeanor. Marc Borgman was Becker's probation officer. In connection with his probation, Becker signed a probation agreement on November 14, 2005, in which he agreed to comply with certain conditions of probation. (*See* Gov't Ex. 1) Among other things, Becker agreed not to have contact with persons known to be or suspected of being engaged in illegal drug use, manufacture, or sale; and to submit to a search of his person, residence, and property "at any time, if reasonable suspicion exists, by a peace officer or probation/parole officer." (*Id.*) Becker also agreed not to use illegal drugs, and to "actively cooperate with, participate in, and complete any programs or services" as directed by his

Probation Officer. (*Id.*)

Becker promptly violated the agreement in two respects. First, at the end of November 2005, he submitted a urine sample that tested positive for drug use. Borgman directed Becker to seek drug treatment, and gave him several options. He directed Becker to obtain an evaluation and enter a treatment program within one month. By January 3, 2006, Becker still had not entered into a treatment program, constituting a second violation of the probation agreement.

Officer Brass knows Becker and where Becker lives as a result of the officer's job patrolling the city of Sheffield. During December 2005, Officer Brass had seen Lisa Seversen visiting at Becker's residence. He had arrested Seversen in October 2005, for possession of a little over a gram of methamphetamine. He arrested Seversen again in late December 2005, again for possession of methamphetamine. Following the December arrest, the officer continued to see Seversen visiting at Becker's home. Officer Brass contacted Borgman to ask what types of activities would violate Becker's probation. From the officer's testimony at the hearing, it was apparent to the court that the officer suspected Seversen and Becker were engaging in illegal drug-related activities, and he was interested in investigating further. The officer told Borgman he believed Becker was violating his probation in associating with Seversen, and they discussed getting into Becker's residence to see if there was any illegal activity taking place there. Borgman believed Becker's association with Seversen before and after her arrest on methamphetamine charges constituted reasonable suspicion to conduct a search of Becker's residence pursuant to the probation agreement. Borgman and Officer Brass previously had talked about searching Becker's home, and they believed Seversen's arrest would give them that opportunity.

On January 3, 2006, at about 1:00 p.m., Borgman went

4

to Becker's residence with the intent of conducting a search of the premises. Borgman was accompanied by Officer Brass and Deputy Jamie Sullivan. Borgman testified he usually, though not always, takes an officer with him to conduct this type of home visit. Borgman was wearing street clothing. The officers were wearing polo shirts bearing their agency logos, and both officers were wearing sidearms. They first made contact with Becker as he was coming out of his garage. Borgman and the officers identified themselves. Borgman told Becker why they were there, and asked if they could go back into the garage. When they entered the garage, Becker's brother Tom was present. The officers told Tom Becker he could either empty his pockets, for officer safety, or he could leave. Tom chose to leave, and he left the premises.

Borgman then asked Becker if they could "have a look around" the garage and residence, and Becker agreed. As they entered the residence, Borgman also asked Becker to provide a urine sample, and Becker complied. As Borgman and the officers approached each room in the house, Borgman again would ask if they could have a look around, and Becker again would agree. Becker accompanied Borgman and the officers through the house and observed as their search took place. He was not handcuffed or restrained in any way, and he never raised a protest or withdrew his consent to the search. No promises or threats were made to Becker at any time.

Borgman and the officers eventually reached a room next to Becker's bedroom in which Borgman could see a safe. He asked Becker if they could take a look in the safe, and Becker agreed. The safe was locked, and at Borgman's request, Becker unlocked the safe, using a key from a key chain on his jeans. Officer Brass bent down to look inside the safe and immediately detected the odor of marijuana. He could see a small bag of marijuana and some money bags in the safe. The officer withdrew the bag of marijuana and also saw a small bag of what appeared to be methamphetamine.

>Becker was asked to open a locked money bag, and he complied.
>
>Borgman or Officer Brass asked Becker if anyone else had keys to the safe, and Becker responded, "No." Borgman asked Becker whose drugs were in the safe, and Becker did not respond. Becker was placed under arrest. The time from Borgman's first contact with Becker until Becker's arrest was approximately twenty to twenty-five minutes.
>
>It is undisputed that no *Miranda* warnings were given to Becker until after his arrest. It also basically is undisputed that throughout the encounter, Borgman used terminology like "have a look around in here," rather than the word "search," when he referred to their examination of Becker's residence. On January 4, 2006, Borgman filed a violation report regarding Becker's violations of his probation agreement. At the hearing, Borgman testified the violation report did not allege Becker had violated paragraph 13 of the agreement, which prohibits him from having contact with known drug users.

Report and Recommendation at pp. 2-4. Upon review of the record, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL ANALYSIS

### A. Standard Of Review

Pursuant to statute, this court's standard of review for a magistrate judge's report and recommendation is as follows:

>A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the

> findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). Similarly, Federal Rule of Civil Procedure 72(b) provides for review of a magistrate judge's report and recommendation on dispositive motions and prisoner petitions, where objections are made, as follows:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

FED. R. CIV. P. 72(b).

The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 519 U.S. 860 (1996); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994)); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*). As noted above, defendant Becker has filed objections to Judge Zoss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Becker's motions to suppress.

### B. *Objections To Report and Recommendation*
#### 1. *Necessity for Miranda warnings*

Defendant Becker initially objects to Judge Zoss's conclusion that his statements

were not made while in custody and therefore no *Miranda* warnings were required to be given to him before he was questioned.

The *Miranda* safeguards only apply to one "who is subjected to custodial police interrogation", *Miranda*, 384 U.S. at 439, which is defined to include the deprivation of one's freedom of action "in any significant way." *Id.* at 444; *accord United States v. Martinez*, 462 F.3d 903, 909-10 (8th Cir. 2006) ("*Miranda* warnings are required only where a person's freedom has been so restricted as to render him 'in custody.'"); *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) ("*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'"); *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005) ("Miranda warnings are required only where a person is deemed to be in custody." ). The *Miranda* doctrine is premised on the assumption that the interaction of custody and police interrogation results in a danger of coercion. *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). As the Eighth Circuit Court of Appeals has pointed out:

> The clearest example of custody is when a suspect is placed under formal arrest. Absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed.2d 1275 (1983) (per curiam); *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (*en banc*), *cert. denied*, 543 U.S. 1145, 125 S. Ct. 1292, 161 L. Ed.2d 105 (2005).

*United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006); *see Black Bear*, 422 F.3d at 661 ("The ultimate inquiry to determine custody for Miranda purposes is whether there was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest."). Whether an individual is in custody is not dependant on the individuals

own subjective belief, "but turns on whether a reasonable person in his shoes would have felt free to end the interview." *Id.* at 1137; *accord Martinez*, 462 F.3d at 909; *LeBrun*, 363 F.3d at 720. The Eighth Circuit Court of Appeals has instructed that in deciding whether a person is in custody, a court must consider "all the circumstances confronting the person when he or she was questioned." *Ollie*, 442 F.3d at 1137; *accord Martinez*, 462 F.3d at 909. The court of appeals has identified several matters that are relevant to a determination of whether an interview is custodial:

> Some considerations generally act to mitigate the custodial atmosphere: These are, for instance, whether the police told the suspect that he or she was free to leave, was free to refuse to answer questions, or was not under arrest; whether the person's movements were unrestrained during the interview; and whether the person either initiated contact with authorities or voluntarily acquiesced to official requests. Other considerations tend to aggravate the interview's custodial nature: They are, among other things, whether the police used coercive or deceptive tactics that restricted the suspect's freedom to terminate the encounter and whether the questioning occurred in a police-dominated atmosphere. *See Axsom*, 289 F.3d at 500; *see also LeBrun*, 363 F.3d at 721. No single consideration is dispositive, nor must they all weigh in the defendant's favor for us to decide that he or she was in custody. *Axsom*, 289 F.3d at 501.

*Ollie*, 442 F.3d at 1137-38.

In support of his objection to this portion of Judge Zoss's Report and Recommendation, defendant Becker directs this court to the Eighth Circuit Court of Appeals's decision in *Ollie*, 442 F.3d 1135. In *Ollie*, the police wanted to talk with the defendant about a handgun found at his girlfriend's house. The police contacted Ollie's probation officer, who agreed to order Ollie to go to the police station the next day after his regularly scheduled probation meeting. *Id*. at 1136. The probation officer ordered the

9

defendant to go to the station after the meeting, where he was interviewed without being given his *Miranda* warnings. Although the defendant was told that he was not under arrest, he was not told that he could refuse to answer questions. After twice stating that he did not own or possess a gun, the defendant admitted handling the gun when the police asked if he would continue to deny ownership of the gun if told that the police found his fingerprints on the weapon. *Id*. at 1137. The defendant then agreed to make a written statement, and was given his *Miranda* warnings. The defendant subsequently moved to suppress statements that he made during his interview with the police and his written statement, arguing that the police's failure to give him *Miranda* warnings at the outset of the interview made all of his statements inadmissible. The district court denied the motion, concluding that the defendant was not in custody when he confessed and therefore the police had no obligation to give the defendant *Miranda* warnings before questioning him. In reversing, the Eighth Circuit Court of Appeals found that the defendant was in custody when he made his statement, and therefore it should have been suppressed. *Id*. at 1140. The court of appeals's reasoning was based in large part on the fact that the defendant was not at the police station voluntarily, but was only there because he had been ordered to go by his probation officer. *Id*. at 1138. The court of appeals found it particularly significant that the defendant's statement was made in a "police-dominated atmosphere", the police station. *Id*. at 1139.

The *Ollie* decision is easily distinguishable from this matter. The most significant factor which led the Eighth Circuit Court of Appeals to conclude that the defendant in *Ollie* was in custody, his presence at the police station, is absent here. In this case, defendant Becker was not taken or ordered to go to the police station for questioning. Rather, defendant Becker was questioned in his own home. The Eighth Circuit Court of Appeals noted in *Ollie* that "the fact that questioning taking place on a suspect's 'home turf' cuts

10

against a finding of custody . . . " *Id.* at 1139 (citing *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984) (holding that police's questioning of defendant in defendant's office at his place of business did not constitute custodial interrogation which would require defendant to be provided with *Miranda* warnings). Furthermore, the questioning here was extremely brief. Probation Officer Borgman testified that only twenty to twenty-five minutes elapsed between their arrival and defendant Becker's arrest. The court notes that, during that time period, Becker was not subjected to a constant stream of questions, but, instead, was asked for, and provided a urine sample, and then accompanied Borgman, Brass and Deputy Sullivan as they searched Becker's residence. The only questioning that occurred during the search prior to the opening of the safe were Borgman's requests to "look around" various rooms in Becker's house. There is no evidence that Borgman, Brass or Sullivan ever raised a voice or threatened Becker. Becker was not restrained. Although Brass and Sullivan were armed, they did not draw their sidearms. Thus, considering all of the circumstances, the court concurs with Judge Zoss's conclusion that Becker was not in custody when he was asked by Borgman or Becker if anyone else had keys to the safe, and therefore the fact that *Miranda* warnings were not given does not bar his response to that question. The court, therefore, overrules defendant Becker's objection as to this portion of Judge Zoss's Report and Recommendation.

### 2. *Reasonable suspicion to conduct search*

Defendant Becker next objects to Judge Zoss's conclusion that his probation officer had reasonable suspicion to conduct a search of his residence under the terms of his probation agreement.

In *Griffin v. Wisconsin*, 483 U.S. 868 (1987), the United States Supreme Court upheld a search of a probationer conducted pursuant to a Wisconsin state regulation permitting "any probation officer to search a probationer's home without a warrant as long

as his supervisor approves and as long as there are 'reasonable grounds' to believe the presence of contraband," *Id*. at 870-871. Although the state regulation that authorized the search was not an express condition of probation in *Griffin*, the Court held that a state's operation of its probation system presented a "special need" for the "exercise of supervision to assure that [probation] restrictions are in fact observed." *Id*., at 875. The Court found that special need for supervision justified the state regulation and the search pursuant to the regulation was thus reasonable. *Id*. at 875-880.

Although the Court in *Griffin* refrained from addressing the standard of individualized suspicion to which probationary searches must conform in the absence of a governing statute, it turned to this question in *United States v. Knights*, 534 U.S. 112 (2001). In *Knights*, the Court determined that a search of a probationer's apartment based upon reasonable suspicion and conducted pursuant to a probation order mandating that he "submit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer," *id*. at 114 (brackets omitted), satisfied the Fourth Amendment's reasonableness requirement. The Court held that "the search . . . was reasonable under our general Fourth Amendment approach of 'examining the totality of the circumstances,' with the probation search condition being a salient circumstance." *Id*. at 118 (citation omitted). The Court instructed that:

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.

*Id*. at 118-19 (citation and internal quotation marks omitted). The Court concluded that,

in the case of a probationer, the imposition of a search condition as part of probation creates a diminished expectation of privacy. *Id*. at 119-20. The Court also noted that because "the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law," *id*. at 120 (internal quotation marks omitted), the state may have a greater interest with respect to probationers than with respect to ordinary citizens in anticipating and attempting to prevent potential violations of the law. *Id*. at 120-21. The Court thus held that:

> [w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

*Id*. at 121.

Because the search at issue in *Knights* was predicated on both the probation search condition and reasonable suspicion, the Court did not reach the question whether the search would have been reasonable under the Fourth Amendment had it been solely predicated upon the condition of probation. *Knights*, 534 U.S. at 120 n. 6. The Court took up that issue last year in *Samson v. California*, 126 S. Ct. 2193 (2006). In *Samson*, the Court examined whether "a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." *Samson*, 126 S. Ct. at 2196. After weighing the interests, the Court upheld a suspicionless search of a parolee's person under a California state law, which requires that parolees agree in writing to be searched with or without cause. The Court held that the "touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." *Id*. at 2201. However, the Court indicated in *Samson* that that decision does not preclude other states from requiring

some form of individualized suspicion: "That some States and the Federal Government require a level of individualized suspicion is of little relevance to our determination whether California's supervisory system is drawn to meet its needs and is reasonable. . . ." *Id*. at 2201. Iowa does not have a statute or regulation that requires individualized suspicion. Instead, under Iowa law, probationers

> are subject to the conditions established by the judicial district department of correctional services subject to the approval of the court, and any additional reasonable conditions which the court or district department may impose to promote rehabilitation of the defendant or protection of the community.

IOWA CODE § 907.6. Unfortunately, the Iowa Supreme Court has not addressed the *Samson* decision to date nor discussed whether Iowa common law requires a level of individualized suspicion. Therefore, the court will address whether the search satisfied the terms of Becker's probation agreement, which required the search to be supported by reasonable suspicion.

Reasonable suspicion has been defined as a "particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1980); *United States v. Cortez*, 449 U.S. 411, 417-18 (1981) (same). The Supreme Court has emphasized that reasonable suspicion is "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7(1989) (citation and quotation marks omitted). The United States Circuit Courts of Appeals have also provided guidance on what constitutes reasonable suspicion, instructing that reasonable suspicion requires more than a hunch but less than probable cause and may be based on the collective knowledge of officers involved in an investigation. *See United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) ( "While reasonable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than

14

preponderance of the evidence,' an officer may not rest on '"nchoate and unparticularized suspicion or 'hunch."'") (citations omitted), *cert. denied*, 126 S. Ct. 1894 (2006); *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) (noting that reasonable suspicion is "something less than probable cause but more than a hunch."); *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) ("A 'reasonable suspicion' of wrongdoing is something stronger than a mere 'hunch,' but something weaker than probable cause."). Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances. *See United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006) (" We consider the totality of circumstances in evaluating whether there was reasonable suspicion that criminal activity was afoot."), *petition for cert. filed*, (U.S. Dec. 7, 2006)(No. 06-8305); *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006) ("In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training." ); *United States v. Morones*, 355 F.3d 1108, 1112 (8th Cir. 2004) ("We examine the totality of the circumstances arguably supporting a determination of reasonable suspicion, evaluating those circumstances as they would be understood by those versed in the field of law enforcement.").

Under the totality of the circumstances in this case, the court concludes that Borgman had reasonable suspicion to conduct a search of Becker's residence under the terms of the probation agreement. Specifically, Borgman had a reliable report from Officer Brass that Becker was associating regularly with someone who had two recent arrests for possession of illegal drugs, Lisa Severson. Becker's probation agreement specifically prohibited him from having contact with "persons known to or suspected of engaging in illegal or questionable activities, including the use, manufacture, or sale/distribution of drugs." Gov't Ex. 1, Becker's Probation Agreement at ¶ 13. Thus, his contact with Severson,

15

standing alone, was a violation of Becker's probation agreement. When this information is considered in conjunction with Becker's positive urine test and his failure to comply with Borgman's directions that he seek drug treatment, the information known to Borgman gave rise to reasonable suspicion that Becker was violating his probation agreement. Therefore, the court finds that the search of Becker's residence was not done in violation of the Fourth Amendment, and also overrules defendant Becker's objection as to this portion of Judge Zoss's Report and Recommendation.

### 3. *Consent to conduct search*

Defendant Becker also objects to Judge Zoss's conclusion that defendant Becker consented to a search of his residence. Defendant Becker argues that his consent to search was not freely, and voluntarily given because he was not informed of his right to refuse Borgman's request to search and because of Borgman's involvement in requesting and conducting the search.

The Eighth Circuit Court of Appeals has instructed that:

> A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given.

*United States v. Gray*, 2006 WL 1523012, at *7 (8th Cir. May 30, 2006). Voluntariness is a fact question to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). The relevant facts to be considered in determining whether consent is voluntary include:

> (1) the individual's age; (2) her general intelligence and education; (3) whether she was under the influence of drugs or alcohol; (4) whether she was informed of her Miranda rights

> prior to any consent; and (5) whether she had experienced prior arrests and was thus aware of the protections the legal system affords suspects.

*United States v. Meza-Gonzales*, 394 F.3d 587, 592 (8th Cir. 2005); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004)(noting the same five factors); *United States v. Mancias*, 350 F.3d 800, 805 (8th Cir. 2003); *United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001) (same); *United States v. Hathcock*, 103 F.3d 715, 719-20 (8th Cir.1997) (same).

Applying the above factors, the court finds that the government has met its burden to establish that defendant's consent was voluntary. On this record, there is nothing to suggest that defendant Becker's will was overborne. At the time of the search, defendant Becker was an adult male who had at least one prior arrest and was thus aware of the protections the legal system affords suspects. The record reflects that Becker was present and cooperated with the search of his residence. The court notes that Becker never raised any protest to permitting the search to continue even though he was asked by Borgman and the officers if they could look around each room of the house before proceeding to search it. At no time did Becker attempt to withdraw or limit his consent to the search. The court further notes that the record does not disclose any evidence that Becker was under the influence of alcohol or drugs at the time he consented, nor did he claim to have been. Although defendant Becker was not read his *Miranda* rights or advised of his right to withhold consent, neither are required for valid consent to search. *See United States v. Montano-Gudino*, 309 F.3d 501, 504 (8th Cir. 2002) ("No 'presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate.'") (quoting *United States v. Drayton*, 536 U.S. 194, 207 (2002)); *Alcantar*, 271 F.3d at 737 ("Although [the defendant] was not advised of his right to refuse consent,

that was not in and of itself sufficient to find that consent was not voluntarily given."). Thus, based on the totality of the circumstances, the court concludes that defendant Becker voluntarily consented to a search of his residence. Therefore, the court also overrules defendant Becker's objection to this portion of Judge Zoss's Report and Recommendation.

### III. CONCLUSION

Therefore, for the reasons set forth above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Report and Recommendation and **denies** defendant Becker's motions to suppress (#20 and #21).

**IT IS SO ORDERED.**

**DATED** this 9th day of January, 2007.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA